

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00126-CV

_____

SANDRA FRANKLIN, Appellant

V.

SHONTINIER BENTON-ELAM, Appellee

On Appeal from the County Court at Law
Houston County, Texas
Trial Court No. 13CCL-084

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Sandra Franklin and Shontinier Benton-Elam maintained a long-term conflict between the two of them because Franklin persisted in carrying on an affair with Benton-Elam's husband, Byron Elam. The two women regularly employed techniques to get their points across that would not be taught in finishing schools of the highest caliber. This ongoing dispute finally precipitated a suit by Franklin in Houston County, Texas,[1] wherein she sought to obtain a family violence or stalking protective order to keep Benton-Elam at a distance from her and her possessions. Although the trial court refused to grant Franklin the kind of order she requested, it did issue an order enjoining Benton-Elam from (1) stalking or physically harming Franklin, (2) communicating with Franklin in a threatening or harassing manner, both directly or through another person, (3) going within twenty-five yards of Franklin's residence, and (4) going to or near Franklin's place of employment.

Dissatisfied with that relief, Franklin, on appeal, argues that the trial court erred in denying the requested protective order because the evidence was legally and factually sufficient to support a finding that family violence or stalking had occurred. Although the injunction entered by the trial court benefits Franklin, she also argues, for the first time on appeal, that the trial court erred in entering only injunctive relief. We find that abuse of discretion is the appropriate standard for reviewing the trial court's denial of Franklin's requested protective order. We further find that no abuse of discretion has been shown in denying the requested

---

[1]Originally appealed to the Twelfth Court of Appeals in Tyler, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Twelfth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

protective order or in the trial court having issued the injunction in lieu of the protective order. Therefore, we affirm the trial court's judgment.

## I.  Factual and Procedural Background

Although married to Benton-Elam and having sired children by her, Byron entered into what appears to have been a lengthy adulterous relationship with Franklin. This affair was discovered by Benton-Elam in 2010, prompting her to go to Franklin's residence to confront her rival for Byron's affections. While there, she informed Franklin that she and Byron were married and that they had children of the marriage together; using that as her rationale, she pleaded with Franklin to disengage herself from the relationship with Byron. This plea by Benton-Elam for the sanctity of her marriage was apparently dismissed out of hand by Franklin. Franklin's refusal to end her affair with Byron led to several unpleasant encounters with Benton-Elam over the course of three years. The final public encounter between the two in 2013 resulted in physical violence and precipitated Franklin's filing of an application for a protective order against Benton-Elam on the basis that Benton-Elam had engaged in family violence and had committed the offense of stalking.

At trial, Franklin accused Benton-Elam of threatening her life. Benton-Elam, who represented herself at trial, neither testified nor otherwise presented an active defense against Franklin's accusations. Notwithstanding Benton-Elam's lack of legal acumen, the trial court apparently did not find Franklin's testimony believable. The court's assessment was based on (1) the fact that Franklin's testimony of encounters with Benton-Elam conflicted with neutral witness testimony of those same encounters, (2) conflicts and contradictions within Franklin's

3

own testimony regarding her encounters with Benton-Elam, and (3) the lack of supporting evidence for much of Franklin's version of the facts.

A.    The May 8, 2011, SONIC Drive-In Incident

There was an incident between Benton-Elam and Franklin on May 8, 2011, at the local SONIC Drive-In (the Sonic) restaurant where Byron was employed.

According to Franklin, she was parked in her automobile at the Sonic when Benton-Elam drove by and noticed her there, whereupon Benton-Elam pulled her car into the parking lot next to Franklin's car.  Benton-Elam then rolled down the window of her vehicle and began to employ derogatory words to describe Franklin and the status of her morals.  This failing to elicit a sufficient response, Benton-Elam got out of her car, walked over to Franklin's car, and continued yelling at and making disparaging comments about Franklin.  In response to Benton-Elam's rant, Franklin claimed, "I looked at [Benton-Elam], shook my head, gave her a chagrin [sic], waited on my drink, and then I left."  Franklin testified that she called for the manager before leaving the restaurant and left the manager to deal with Benton-Elam.[2]

Brenda Whitehead, the manager of the Sonic at the time of this incident, recalled a much different version of the events from that related by Franklin.  Whitehead testified that although it was true that Benton-Elam was, indeed, yelling insults at Franklin, both women remained inside their vehicles throughout the incident.  In direct contradiction of Franklin's testimony, Whitehead testified that Benton-Elam never exited her vehicle.  During the confrontation, Franklin asked Whitehead to place herself between the combatants' parked vehicles to diffuse

---

[2]While Franklin testified that Benton-Elam was "yelling and screaming and cursing [her] out," there was no allegation that Benton-Elam threatened Franklin with bodily injury or harm.

4

the verbal battle. Whitehead further recalled that Benton-Elam (obviously making reference to Franklin) stated, "'That's the whore that's sleeping with my husband.'" Contrary to the assertion made by Franklin in her July 8, 2013, sworn affidavit filed in support of her application for a protective order (the Affidavit) that "[a]n officer responded" to the Sonic incident, Whitehead made no mention of police involvement. Instead, Whitehead testified that Benton-Elam and Franklin both drove away in their cars after Whitehead had intervened to calm the situation.

### B. The May 2013 Beauty Salon Incident

Franklin and Benton-Elam both frequented a local beauty salon owned by Lillian Marshall. Franklin testified that she was at the salon sometime in May 2013 when Benton-Elam walked in, saw that Franklin was there, went into a "rampage," and started talking to and cursing at Franklin. Franklin's description of this incident in her supporting affidavit stated, "[Benton-Elam] was cursing and yelling statements towards me. [Benton-Elam] came and stood right in front of me attempting to provoke me into an altercation."

Marshall confirmed that Benton-Elam came into the salon to make a hair appointment, saw that Franklin was getting her hair done, and became visibly upset. However, the rest of Marshall's testimony directly contradicted Franklin's account of the events. According to Marshall, Benton-Elam simply informed her that Franklin was the woman with whom Byron was engaging in an illicit affair and then left immediately after making this statement. As Marshall recalled the events, Benton-Elam neither said anything to Franklin nor otherwise provoked Franklin. Marshall further testified that this incident was the only time that Franklin and Benton-Elam were simultaneously seen in the beauty salon.

5

## C. The June 29, 2013, Dollar General Incident

The escalating tension between Benton-Elam and Franklin apparently reached its climax June 29, 2013, when the women were involved in yet another public altercation at the local Dollar General. Although there are different versions of the incident, one thing is clear from surveillance footage obtained from Dollar General—Benton-Elam struck Franklin. The video-recorded surveillance footage depicts the following: (1) Benton-Elam entered the store as Franklin was exiting it, and Benton-Elam engaged her verbally; (2) Franklin walked away from the entrance toward the parking lot, leaving Benton-Elam at the entrance of the Dollar General; (3) rather than continue into the store as she had apparently originally intended, Benton-Elam altered her course and followed Franklin into the parking lot; (4) seconds later, Benton-Elam ran toward the side of the parking lot opposite from Franklin, but continued to verbally engage Franklin; (5) Benton-Elam approached the Dollar General entrance, appearing to "shoo" Franklin away with a flick of her wrist; (6) instead of leaving, Franklin walked toward the entrance and verbally engaged Benton-Elam; (7) onlookers futilely attempted to intervene; (8) Benton-Elam walked away from Franklin for a moment but then reversed direction and quickly moved back toward Franklin; (9) after a brief pause, Benton-Elam aggressively advanced toward Franklin and engaged her physically; (10) while the first blow cannot be seen on the surveillance footage, it is clear that Franklin and Benton-Elam fully engaged in a physical altercation; (11) Benton-Elam dragged Franklin to the ground, sat astride her while continuing to strike Franklin; and (12) the women rolled around on the ground in each others' clutches at the entrance of the Dollar

General for several seconds doing battle until a number of passers-by, working together, were able to separate them.

Wendy Williams, the manager of the local Dollar General, witnessed the altercation between Franklin and Benton-Elam. According to Williams, Franklin was inside her car, exited her vehicle, approached Benton-Elam, and argued with her face-to-face before the confrontation graduated to the level of physical contact. Williams testified that Benton-Elam hit Franklin in the head after Franklin asked Williams to call the police. Williams stated that the two women "were rolling on the ground fighting" as she called the police.

Franklin presented a slightly different, decidedly self-serving, version of the Dollar General incident. According to Franklin, Benton-Elam commenced a verbal tirade at her, but she ignored the tirade by walking the other direction and entering her car in the parking lot. Franklin claims she did not immediately drive away because Benton-Elam began "vandalizing [Franklin's] car by hitting on the window" and she wanted the police to see the damage so that they would apprehend Benton-Elam. Franklin testified, "[Benton-Elam] pulled my mirror apart from my car and then she actually dented the side of my car." Franklin opined that Benton-Elam ran across the parking lot away from Franklin's car as a result of Franklin reaching into her purse to retrieve her cell phone. Franklin believed that Benton-Elam's flight was then prompted by a desire to avoid being apprehended by the police. Franklin claimed that the only reason she exited her vehicle was to prevent Benton-Elam from leaving. Franklin further testified that her telephone slipped from her hands and that she walked back to the Dollar General entrance, in spite of Benton-Elam's physical presence there, to ask the store manager to call the police.

7

Franklin testified that Benton-Elam struck the first blow. Franklin added that a witness, Maggie Mitchell, and the police officer who responded after the authorities were called saw Benton-Elam's handprints on her car and could testify about the damage caused to her car.

No witness, other than Franklin, testified that Benton-Elam caused any damage to Franklin's car. In fact, Mitchell, who stated that she went to Franklin's home after the altercation to see if Franklin was all right, testified to the contrary. According to Mitchell, during her visit with Franklin following the incident, Franklin showed Mitchell the alleged damage to her vehicle. Mitchell stated that there was nothing broken on the vehicle and that she observed no dents in the vehicle. Mitchell also testified that Franklin, at some point in time, claimed that she usually carries a gun with her.

Isaias Rodriguez, an officer with the Crockett Police Department, arrived at the Dollar General to find Benton-Elam using profanity to describe Franklin. Rodriguez testified that Franklin had scratches on her face and lip and sustained an injury to her elbow during the altercation between the two women. Rodriguez said nothing about Franklin's car. According to Rodriguez, Benton-Elam claimed that Franklin had a gun. After talking to witnesses and watching the video recording from surveillance cameras, Rodriguez determined that Benton-Elam was the primary aggressor and arrested her for disorderly conduct. Rodriguez' decision to arrest Benton-Elam was made with the knowledge that Franklin had recently filed several reports against Benton-Elam with the Crockett Police Department.

Rodriguez testified that Franklin visited with him on June 13, 2013, and wanted to inform him of several episodes involving Franklin and Benton-Elam that had transpired over the years.

8

According to Rodriguez, other officers within the Crockett Police Department had previously spoken to both Benton-Elam and Franklin over the years about their behavior.

### D.      The Uncorroborated Encounters

At the trial of this matter, Franklin testified to a significant number of alleged encounters with Benton-Elam that are unsupported by any evidence other than Franklin's own testimony. What follows is a summary of these uncorroborated encounters, as testified to by Franklin. On July 10, 2010 (soon after Benton-Elam had first asked Franklin to terminate her relationship with Byron), Franklin claimed that Benton-Elam returned to her home to confront her about the continued affair. Franklin testified,

> The second time [Benton-Elam] came to my house she knocked on the door and she did -- when she knocked on the door she changed her voice -- disguised her voice and said -- I said, "Who is it?" She said, "Byron", [sic] and I said, "Who?" And I opened -- ajarred the door just a little bit and she -- she pushed against the door, and she started reaching in the door and pushing in towards -- trying to push in towards my kitchen and reaching in talking about "you trying to get my husband, bitch? You trying to get my husband, bitch", [sic] and I pushed against it and then I thought about it and I was right there in the kitchen and I went to reach for a knife, and then she -- she had someone else with her and she ran -- they began to run across the street, and she ran into someone else's apartment, and by the time the police got there, in which Officer Rodriguez was the one who took that report, she -- he couldn't find her.

Franklin claimed that she was injured and had scratches on her arms from Benton-Elam grabbing her through the door. The incident was reported to the police, but the case was closed pending the receipt of additional information.[3]

---

[3]Franklin also included a version of this encounter in the Affidavit; however, a comparison of her trial testimony to the averments of the Affidavit reveals significant discrepancies between the two. In the Affidavit, Franklin swore (1) that there were two other women with Benton-Elam rather than just one, as she recalled at trial, (2) that all three women tried to push the door open, instead of only Benton-Elam pushing against the door, as alleged at trial, (3) that

9

On December 6, 2010, Franklin testified that she heard Benton-Elam yelling for Byron from her front lawn, even though Byron was not then present. Franklin testified that she knew Byron was not in the home because her home security alarm would have alerted her had he broken in and hidden in her home. Franklin called the police to issue a trespass warning against Benton-Elam. Franklin testified that a criminal trespass warning was issued and that she had no further encounters with Benton-Elam at her home.

Franklin testified about a series of alleged encounters with Benton-Elam that occurred soon after her affair with Byron commenced. Franklin testified that Benton-Elam would approach her in public with the purpose of convincing her to leave Byron. When it became apparent that Franklin had no intention of ending the adulterous relationship, the public encounters became increasingly less pleasant. Franklin testified that Benton-Elam would follow her into Walmart and local grocery stores, calling her names as Franklin shopped. Franklin claimed that Benton-Elam saw her once in front of a Chinese restaurant and threatened to beat her. According to Franklin, Benton-Elam even came to Franklin's church, sat behind her, and "made different snarls and snares."

Right before the Sonic incident, Franklin testified that Benton-Elam, while driving her automobile, saw Franklin also driving on the road. Benton-Elam attempted to swerve her car into the lane occupied by Franklin's, told Franklin that she was going to beat her, and instructed Franklin to pull over. Franklin testified that she pulled over into a Walmart parking lot as she dialed 9-1-1. Franklin said that an officer approached her, took her statement, and asked her if

in defense of herself, Franklin "grabbed some scissors behind the door," as opposed to a knife, as alleged at trial, and (4) that the group scattered after someone said that Franklin had a gun, a contention not mentioned at trial.

she knew Benton-Elam's whereabouts. Franklin claimed that she pointed to Benton-Elam, who was driving away. According to Franklin, the officer witnessed Benton-Elam's evasion, but did nothing.

Franklin testified that on April 7, 2012, while Franklin was in the hospital, Benton-Elam called her cell phone and told Franklin to stop messing with her family. According to Franklin, Benton-Elam said that she did not have to fight Franklin because she would get someone else to damage Franklin's vehicles to teach her a lesson. Franklin testified that when she returned home from the hospital, her house had been vandalized and that many items had been stolen. Noting that Franklin said nothing about her home alarm, the trial court asked why it had not gone off during the robbery. In direct contravention of her earlier testimony, Franklin told the court that she did not install the alarm until after the robbery. After the trial court pointed out that Franklin's testimony appeared to contradict her earlier statement that her home had an alarm system in December 2010, Franklin then testified that her previous alarm system contract had expired and that she did not install a new system until after the robbery.[4]

These alleged encounters were apparently reported to Rodriguez sixteen days before the June 29 Dollar General incident. Franklin testified that she reported these incidents to the police so she "could collectively have all of the information to give" to the county attorney so that she could pursue a protective order against Benton-Elam.

---

[4]It would appear that Franklin took some poetic license in the relation of the events related to Benton-Elam's hospital phone call as well. Franklin claimed that she called the police to the hospital room so that she could give a statement and that Benton-Elam called again, this time on the hospital room telephone, while the police officer was there. She further claimed that the officer picked up the telephone and actually spoke to Benton-Elam.

### E. Incidents Involving Franklin's Son

Benton-Elam also had a few encounters with Franklin's son, Lance Franklin. Michelle Wigfall owned a landscaping business that had just employed Lance. Wigfall and Lance were preparing to mow Benton-Elam's yard when Benton-Elam approached them and began angrily speaking about Franklin and accusing them of spying on her in Franklin's behalf. According to Lance, Benton-Elam indicated a belief that due to Franklin's relationship with Byron, it was disrespectful for Lance to be on Benton-Elam's property. Lance testified that Benton-Elam offended him by using derogatory words to describe his mother. However, Lance testified that Benton-Elam made no threats toward Franklin; instead, he testified that Benton-Elam told him to tell Franklin to stay away from Byron and asked him to explain to Franklin that her affair with Byron was wrong. Benton-Elam, Wigfall, and Lance had a lengthy discussion in which Wigfall explained that she was unaware of the circumstances, that Lance was innocent and had no control over his mother's actions, and that they were only there to mow the yard. Lance testified that Benton-Elam apologized for the outburst.[5]

A few days after this incident, Benton-Elam saw Wigfall and Lance mowing another yard. Benton-Elam apologized again to Wigfall for the earlier outburst at her home. Then, Benton-Elam attempted to explain the earlier outburst to Wigfall and Lance by showing them pictures demonstrating Byron's infidelity, including graphic pictures of Franklin. Lance testified that he believed Benton-Elam was a threat to his mother.

---

[5]Contrary to her son's testimony, Franklin averred in the Affidavit that Benton-Elam threated to beat Lance.

Another encounter between Benton-Elam and Lance was initiated when Benton-Elam saw Lance as he drove by and she motioned to him to stop, which he did. Benton-Elam then told Lance, in an inappropriate and graphic manner, to tell his mother to stay away from Byron. She next stated, "'Hold on. Wait. I got somebody for you.'" Lance testified that he drove off because he interpreted Benton-Elam's statements as an indication that she was retrieving someone from inside the house to come out and fight him. Lance testified that Benton-Elam called him a coward and yelled other nonsense at him as he drove away. Despite these encounters, Lance testified that Benton-Elam was not a threat to him.

## F.      The Trial Court's Findings of Fact and Conclusions of Law

After hearing the evidence, the trial court denied Franklin's application for a protective order. The court noted that Franklin and Benton-Elam were both "doing messy, stupid things to put themselves in a messy, stupid situation." In its findings of fact, the trial court wrote, "Although, [Franklin] testified that threats were made of physical harm, the testimony of other witnesses did not support this testimony. The Court did not find [Franklin]'s testimony credible." The court found that both were at fault for the "mutual combat fight" at the Dollar General.

In its conclusions of law, the court found that although "the two people were in the same location on several occasions over three and one-half years and that on several occasions [Benton-Elam] cursed and made derogatory remarks about [Franklin]," the elements of stalking were not proven. Because the court believed the Dollar General altercation was "a situation in which both parties were involved in a fight not in which one party attacked the other party," it

13

concluded that there were no acts committed against a victim of family violence and that, consequently, Franklin was not entitled to a protective order against Benton-Elam. However, the court granted Franklin injunctive relief, enjoining Benton-Elam from continuing the churlish behavior.

## II. Standard of Review

Although there is a split among the intermediate appellate courts regarding the proper standard of review, we, like the Twelfth Court of Appeals, review the denial of a protective order for an abuse of discretion—the same standard used to review injunctions. *In re Epperson*, 213 S.W.3d 541, 542–43 (Tex. App.—Texarkana 2007, no pet.); *Scott v. State for Protection of Tabler*, No. 12-04-00041-CV, 2005 WL 1315625, at *1 (Tex. App.—Tyler May 31, 2005, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

## III. Franklin's Arguments and Analysis

Franklin sought a protective order (1) as the victim of the offense of stalking and (2) as the victim of family violence. Franklin argues that the trial court abused its discretion in denying the requests for a protective order because it (1) determined that the law allowing for a family violence protective order does not apply to a dating relationship that involves adultery, (2) found that the elements of stalking required a verbal threat or physical violence toward Franklin, and (3) required Franklin to produce evidence of the disposition of police reports made by Franklin

14

against Benton-Elam. Franklin also argues that the trial court abused its discretion in entering the injunction because a "general permanent injunction is not a permitted remedy when the relief the applicant is seeking is a protective order."

Under The Texas Family Code, "A court shall render a protective order . . . if the court finds that family violence has occurred and is likely to occur in the future." TEX. FAM. CODE ANN. § 81.001 (West 2014). Family violence includes dating violence. TEX. FAM. CODE ANN. § 71.004(3) (West 2014). "Dating violence" means

> (a)     . . . an act, other than a defensive measure to protect oneself, by an actor that:
>
> > (1)     is committed against a victim:
> >
> > . . . .
> >
> > (B)     because of the victim's marriage to or dating relationship with an individual with whom the actor is or has been in a dating relationship or marriage; and
> >
> > (2)     is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or sexual assault.

TEX. FAM. CODE ANN. § 71.0021(a) (West 2014).

### A. The Trial Court Properly Applied the Dating Violence Provisions of the Texas Family Code

Franklin's first argument is easily dismissed. Contrary to her assertions, the trial court specifically found that Franklin "could be a protected person pursuant to [Texas Family Code] Section 71.0021 – Dating Violence in that she had an ongoing dating relationship with someone" to whom Benton-Elam was married.

15

However, the trial court, disbelieving those portions of Franklin's testimony alleging incidents of violence, simply found that no "dating violence," as that term is defined by the statute, had occurred. As the trier of fact, the trial court is the sole judge of the weight and credibility of the evidence and is entitled to resolve any conflicts in the evidence and to choose which testimony to believe. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)*; see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Walker & Assocs. Surveying, Inc. v. Austin*, 301 S.W.3d 909, 916–17 (Tex. App.—Texarkana 2009, no pet.). The fact-finder may choose to believe one witness over another, and we, as the reviewing court, may not substitute our judgment for that of the fact-finder. *Golden Eagle Archery*, 116 S.W.3d at 761; *Walker & Assocs. Surveying, Inc*., 301 S.W.3d at 916. Rather, we must simply ask whether, "based on the elicited evidence, the trial court made a reasonable decision, or whether it is arbitrary and unreasonable." *Thompson v. Thompson O'Rear*, No. 06-03-00129-CV, 2004 WL 1243080, at *2 (Tex. App.—Texarkana Jun. 8, 2004, no pet.) (mem. op.).

The acts and conduct attributed to Benton-Elam by the evidence presented at trial are, for the most part, in the nature of harassment. "At some point, harassment may transform into an active threat." *Id.* at *3. Here, however, the trial court clearly dismissed Franklin's testimony and found that no testimony from others established that an active threat of physical harm was made by Benton-Elam. Also, the trial court refused to characterize Franklin as a victim. Instead, the court concluded that the only physical contact between them occurred in response to mutual provocation. A trial court may deny a family violence protective order, even where there is

16

evidence of a physical confrontation, if the confrontation is caused by the alleged victim's goading and there is no other prior threat of violence or actual violence. *See id.* at **3–4.

Further, before issuing a family violence protective order, a court is required to find that family violence is likely to occur in the future. Here, the court heard testimony that Benton-Elam had not been to Franklin's house since 2010 and that—aside from the mutual confrontation at the Dollar General—no physical harm had come to Franklin over the span of three years. In light of this fact and the trial court's injunction prohibiting Benton-Elam's contact with Franklin, the trial court could reasonably find that family violence was not likely to occur in the future.[6] Considering this evidence, we cannot conclude that the trial court abused its discretion in denying the family violence protective order.

### B. The Trial Court Properly Applied the Stalking Provisions of the Texas Code of Criminal Procedure

Franklin's second argument on appeal, that the trial court misconstrued the elements of stalking under Article 7A.01(a)(1) of the Texas Code of Criminal Procedure, is also unavailing. Contrary to Franklin's assertions on appeal, the trial court merely found that Franklin's entitlement to a protective order under Article 7A.01 required proof through credible evidence that Franklin had been a victim of the offense of stalking. *See* TEX. CODE CRIM. PROC. ANN. art. 7A.01(a)(1) (West Supp. 2013). A person commits the offense of stalking if

> (a)    . . . the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

---

[6]We note that more than one act of physical violence is not required to prove that a person is likely to commit family violence in the future. As we have stated before, "Oftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *Epperson*, 213 S.W.3d at 544. The decision in this case was left to the fact-finder, and we will not disturb it.

17

(1) constitutes an offense [of harassment], or that the actor knows or reasonably should know the other person will regard as threatening:

(A) bodily injury or death for the other person;

(B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or[7]

(C) that an offense will be committed against the other person's property;

(2) causes the other person, . . . to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person to:

(A) fear bodily injury or death for himself or herself;

(B) fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;

(C) fear that an offense will be committed against the person's property; or

(D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

TEX. PENAL CODE ANN. § 42.072(a) (West Supp. 2013). Section 42.072(c) states, "[A] trier of fact may find that different types of conduct described by Subsection (a), if engaged in on more than one occasion, constitute conduct that is engaged in pursuant to the same scheme or course of conduct." TEX. PENAL CODE ANN. § 42.072(c) (West Supp. 2013).

---

[7]Lance testified he did not feel threatened by Benton-Elam.

The trial court did not believe that the credible evidence established that Benton-Elam had committed the offense of stalking. Discounting Franklin's testimony, the court found no previous threats of physical violence.[8] Thus, the court implicitly found that any threats of physical violence had not occurred on more than one occasion. Also, the trial court found that Benton-Elam was not purposefully following Franklin, but that the two happened to run into each other at various locations within their shared community over the course of three and one-half years. In making this statement, the court characterized the meetings established by the credible evidence as chance encounters rather than conduct occurring pursuant to the same scheme or course of conduct.

The trial court refused to characterize Benton-Elam's rants as conduct that (1) Benton-Elam knew or should have known Franklin would regard as threatening bodily injury or (2) would cause a reasonable person to fear bodily injury, especially since no physical harm had come to Franklin over the years. *See* TEX. PENAL CODE ANN. § 42.072(a)(1)(A), (a)(3). Because Franklin got out of her car during the Dollar General incident and advanced toward Benton-Elam, the court could have concluded that Franklin did not demonstrate a fear of bodily injury or death. Simply put, absent Franklin's testimony, there was no evidence that Benton-Elam had, on more than one occasion and pursuant to the same scheme or course of conduct, threatened or harassed Franklin with bodily injury or with injury to her property. Therefore, we cannot say

---

[8]There was, likewise, no testimony, other than Franklin's, suggesting that Benton-Elam threatened Franklin's property.

that the trial court's denial of a protective order under this section constituted an abuse of discretion.[9]

### C.  The Trial Court's Injunction Was Proper

Franklin's third appellate issue contends that the trial court required her to produce evidence of the disposition of the complaints or reports she filed with the police against Benton-Elam.  This is an inaccurate reading of the record.  Rodriguez testified that, in total, Franklin had filed seven reports with the police department over the course of three and one-half years.  Realizing the first complaint by Franklin against Benton-Elam had not been pursued, that Franklin's testimony seemed inconsistent, and that officers who received these reports from Franklin were not called to testify, the trial court stated, "I'm not going to consider [the reports] because I don't know if they were frivolous or unfrivolous, and I'm going to assume they're all frivolous . . . unless I hear contrary evidence."  The trial court made a ruling on evidence and did not require that Franklin produce the police reports.  Contrary to Franklin's assertions, the statement does not add to or in any way alter the elements Franklin was required to prove to establish stalking under Section 42.072(a).

Franklin now argues, for the first time on appeal, that the trial court erred in issuing an injunction against Benton-Elam.  "The effects of a family violence protective order continue to stigmatize individuals long after the date of expiration." *Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex. App.—Corpus Christi 2008, no pet.).  The stigma is not only a social burden; there are

---

[9]Even if Franklin felt harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended as defined by subsections (a)(2) and (a)(3), the trial court was not required to find that Benton-Elam committed the offense of stalking unless it first found that the acts occurred pursuant to the same scheme or course of conduct and that subsection (a)(1) had been met.

very real and very significant legal consequences that flow from the entry of a family violence protective order. *Id.* For example, in determining whether to appoint a party as a sole or joint managing conservator, courts consider whether a family violence protective order has been entered against the person seeking conservatorship. *See* TEX. FAM. CODE ANN. § 153.004 (West 2014). Here, the trial court was aware that Benton-Elam had filed for divorce from Byron and that there were several children of their marriage. In an effort to provide the relief sought by Franklin while also disassociating Benton-Elam from the stigma and legal consequences that could flow from entry of a protective order against her, the trial court decided to issue injunctive relief instead.

Citing to the Rules authorizing statutory protective orders, Franklin argues that the court was without authority to enter the injunction. However, a protective order is an injunction because it provides for injunctive relief. *See Thompson*, 2004 WL 1243080, at \*1. In this case, the court issued relief similar to that sought by Franklin in her pleadings. To the extent Franklin complains that the trial court had no authority to enter the injunction, the complaint is overruled in light of Franklin's pleadings. Franklin advances no other argument suggesting that the trial court abused its discretion in issuing the injunction.

Considering the facts and circumstances of this case, we cannot conclude that the trial court acted without reference to any guiding rules and principles or that it reached a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. Therefore, we overrule Franklin's points of error.

## IV.     Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:      March 14, 2014
Date Decided:        April 30, 2014